NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1571

DIONYSIA F. HUVAL PREJEAN

VERSUS

RONALD JOSEPH PREJEAN, JR.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2009-10001 "H"
HONORABLE DAVID BLANCHET, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Marc T. Amy, and Billy Howard Ezell, Judges.

MOTION TO STAY APPEAL DENIED, JUDGMENT AFFIRMED.

James Marshall Montgomery
Attorney at Law
802 Johnston St.
Lafayette, LA 70501
(337) 269-0083
COUNSEL FOR DEFENDANT APPELLEE:
    Ronald Joseph Prejean, Jr.

**George Andrew Veazey**
**Huval, Veazey, Felder, & Renegar, L.L.C.**
**P. O. Box 80948**
**Lafayette, LA 70598-0948**
**(337) 234-5350**
**COUNSEL FOR PLAINTIFF APPELLANT:**
    **Dionysia F. Huval Prejean**

**Bradford Hyde Felder**
**Huval, Veazey, Felder, & Renegar, L.L.C.**
**P. O. Box 80948**
**Lafayette, LA 70598-0948**
**(337) 234-5350**
**COUNSEL FOR PLAINTIFF APPELLANT:**
    **Dionysia F. Huval Prejean**

**Julie Koren Vaughn Felder**
**Attorney at Law**
**P. O. Box 80399**
**Lafayette, LA 70598**
**(337) 856-3444**
**COUNSEL FOR PLAINTIFF APPELLANT:**
    **Dionysia F. Huval Prejean**

**SAUNDERS, J.**

As a preliminary matter, we deny the Appellant's motion to stay the appeal. We have reviewed the proceedings. There is nothing pending in the underlying matter, and we find no compelling reason to grant a continuance. Appellant's motion to stay the appeal is denied.

This matter arises from a custody dispute between the mother and father of two minor children. The trial court awarded custody to the father, assigned him as domiciliary parent, and ordered the mother to pay child support. It is this judgment that the mother appeals.

**FACTS**

The matter before us involves the custody of two minor boys, Tyler and Noah Prejean (hereinafter "Tyler" and "Noah"). The boys' parents, Dionysia Prejean (hereinafter "Dodie") and Ronald Prejean (hereinafter "Ron") married on February 24, 2001. Tyler, born on August 6, 1995, is Dodie's biological son and Ron's adopted son. Tyler became a child of the marriage through an intra-family adoption which was concluded in October 2001. Tyler's biological father is Robert Arceneaux (hereinafter "Robert"). Noah, born October 8, 2007, is a child of Dodie's and Ron's marriage. The parties physically separated in November of 2008 and divorced on February 17, 2010.

After the parties separated, Ron began dating a woman named Jeanne. Ron and Jeanne moved in together in March of 2009 and got married on February 11, 2011. Ron has been employed at Our Lady of Lourdes Hospital for fifteen years. Jeanne was a registered nurse but quit working to assist with Ron's children after the breakup of his previous marriage. Jeanne is the mother of a five-year-old daughter, Lauren, by a prior marriage. Ron and his family reside in a three

bedroom, two bathroom home in Youngsville, Louisiana. Tyler and Noah share a room together and Lauren has her own bedroom.

Dodie is currently unmarried. She was initially employed at Workplace Staffing as a manager, but resigned in January 2010. Thereafter, Dodie worked at a furniture store for several months and at KATC television station for approximately two months. Since the summer of 2010, Dodie has worked at Link Staffing in Crowley, Louisiana, working weekdays. Dodie remained in the family home after the divorce. She lives on a rural thirty acre tract of land in Egan, Louisiana in a three bedroom, two bathroom trailer. Dodie's parents live on the same property in a home about fifty yards away. Dodie's grandmother also lives in a home on the same land a couple of acres away from Dodie's home.

Tyler and Noah have been attending school in Acadia Parish. At the time of trial, Tyler was a freshman at Iota High School in Iota, Louisiana and played on the football team. Noah was in third grade at Egan Elementary School in Egan, Louisiana.

**PROCEDURAL HISTORY**

On January 5, 2009, Dodie filed a petition seeking divorce and incidental relief including joint custody, her being named domiciliary parent, child support, and use of the family home. A Hearing Officer Conference was held on February 19, 2009, and recommendations were made on the incidental matters. Ron filed an objection to the hearing officer's recommendations shortly thereafter. At the request of both Dodie and Ron, the recommendations were not made a temporary judgment. Instead, Ron's counsel advised the trial court that a consent judgment would be submitted.

A stipulation was entered on October 1, 2009 giving the parties joint custody and naming Dodie the domiciliary parent. The consent decree granted Ron

2

visitation rights on alternating weekend periods. The Stipulated Judgment contained no holiday visitation schedule, other than a provision that said such matters would be agreed upon by the parties, nor did it contain provisions regarding the exchange of the children. The parties did not submit a joint custody plan to the court.

In March of 2010, Ron filed a Rule for Change of Custody and Contempt against Dodie seeking domiciliary status, contempt of court for not allowing court ordered visitation, and for child support. Later that month, Dodie filed a Rule to Show Cause Why Child Custody Should not be Modified and sought sole decision making authority regarding the children's health. On April 29, Dodie pursued child support enforcement services from Louisiana's Department of Social Services, which instituted a Rule to Increase Child Support on May 12, 2010.

A Hearing Officer conducted a conference on the pending rules, except child support, on May 10, 2010. The only recommendation issued suggested that Ron receive visitation rights on alternating weeks during the summer. The recommendation was made a Temporary Order on May 18, 2010.

The trial court had set a hearing on the pending rules on May 25, 2010, but that hearing was continued upon a motion by Dodie's then counsel. The hearing was reset for June 22, 2010. The hearing resulted in a stipulation, where Ron and Tyler would engage in reconciliation counseling at Dodie's cost. The stipulation further provided that Noah would undergo an evaluation for autism spectrum disorders, including Asperger's Disorder, at Dodie's expense. Both parties' counsel agreed that Dodie's lawyer would prepare a judgment approved as to form and content by both parties to resolve the remaining issues, but no judgment was ever submitted. Dodie substituted counsel on August 13, 2010.

A Hearing Officer conducted a conference on the rule to increase child support on July 29, 2010. Afterwards, Ron's child support obligation was increased from $312.97 per month to $575.00 per month, plus a five percent collection fee. Ron did not object to that recommendation, and the court signed the immediate income assignment order on August 6, 2010.

On August 18, 2010, Ron filed a Motion and Order for Ex Parte Temporary Custody and a Rule for Custody and Supervised Visitation, and a Motion and Order for Drug Testing. Thereafter, the court granted Ron temporary custody of the children and ordered that Dodie's visitations be supervised by her parents, pending a hearing scheduled for September 14, 2010.

At the September 14, 2010 hearing, the court maintained Ron's temporary custody and Dodie's supervised visitation. The court removed Dodie's parents as visitation supervisors due to their behavior, and replaced them with Dodie's grandmother. The court also ordered a custody evaluation of the parties and the children.

On September 24, 2010, the parties presented an Order for Mental Health Evaluation to the court, agreeing to appoint Jennifer Moore, LPC, MS (hereinafter "Moore") to conduct a custody evaluation. Ron and Dodie also submitted a "judgment" wherein they agreed that Dodie's visitation would be supervised by Dodie's grandmother and/or would take place at the Avec Les Enfants Visitation Center in Lafayette, Louisiana, and that Noah would be evaluated by Dr. Scott Eckholdt, PhD, M.P. (hereinafter "Dr. Eckholdt") for Asperger's Disorder and ADHD. This stipulation lacked details as to how the children would be transferred between the parties and details regarding Dr. Eckholdt's evaluation. The court signed the order and judgment that same day. Dr. Eckholdt's report to the court

was finalized on November 11, 2010. Moore submitted her report on January 6, 2011.

In December 2010, the parties submitted rules for contempt against each other. Ron filed a Rule for Child Support and Contempt against Dodie, alleging that her visitations had not been supervised by her grandmother. Thereafter, Dodie filed a Rule for Contempt against Ron alleging that he impeded upon her visitation privileges.

Trial was held on all pending issues on January 11, 2011, February 25, 2011, and March 14, 15, and 18, 2011. At the trial's conclusion, the court lifted the provision requiring Dodie's visitation be supervised. Further, the parties agreed that Dodie's alternating visitation would commence when she was to pick up Noah from school until Monday morning when she was to return him to school. Additionally, the parties were to alternate custody of the children on a weekly basis during the summer. The court made Ron the domiciliary parent, ordered Dodie to pay child support, and assessed costs to her. It is from this judgment that Dodie appeals.

On December 19, 2011, while the underlying judgment was on appeal but not yet lodged with this court, Dodie filed a Motion to Annul Judgment and Request for an Expedited Hearing. There, she alleged that Ron and Robert Arceneaux, Tyler's biological father, conspired to remove the children from her custody and influenced Tyler to lie in his testimony. Also on December 19, 2010, Dodie filed a Motion to Recuse, requesting that the trial judge recuse himself. Both motions were denied.

**ASSIGNMENTS OF ERROR**

1.  The trial court erred in awarding ex parte temporary custody of the children to Ron and limiting Dodie's visitation with Noah to supervised visits every other weekend from Saturday morning at 9:00 a.m. to Sunday afternoon at

5:00 p.m. and for failing to sanction Ron for his false and slanderous allegations against Dodie.

2. The trial court erred in finding a material change of circumstances occurred between the time of the October 1, 2009 Stipulated Judgment and the March 24, 2010 Rule for Change of Custody filed by Ron. Alternatively, the trial court erred in finding a material change of circumstances occurred between the time of the October 1, 2009 Stipulated Judgment and the August 18, 2010 Motion for Ex Parte Custody.

3. The trial court erred in finding it was in the best interest of the children for Ron to be named domiciliary parent and for Dodie to have visitation every other weekend and alternating holidays.

4. The trial court erred in ordering "reconciliation counseling" for Dodie and Tyler, that these counseling sessions be conducted on a weekly basis, and that they continue until otherwise recommended by the counselor.

5. The trial court erred in ordering that Noah commence counseling and that this counseling continue at such frequency and for such duration as the counselor recommends.

6. The trial court erred in finding Dodie to be voluntarily underemployed and to have an earning capacity of $2,988.36 [per] month, an amount that she had not earned for eighteen months prior to the Judgment and was not capable of earning at the time of trial.

7. The trial court erred in awarding Ron child support in the amount of $807.33 per month.

8. The trial court erred in assessing Dodie with all costs of the proceedings except the costs of her rule for contempt.

9. The trial court erred when it failed to grant Dodie exclusive authority to make decisions regarding medical treatment and testing for Noah.

**LAW AND ANALYSIS**

It is clearly stated by this court that the standard of review in matters involving custody is an abuse of discretion:

> A court of appeal cannot set aside a finding of fact of the trial court unless it is manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). If the findings of fact are reasonable in light of the evidence viewed entirely, an appellate court may not reverse those findings even if it would have weighed the evidence differently. *Id.* Specifically,

> [t]he standard of review in child custody matters has been clearly stated by this court:
>
> > The trial court is in a better position to evaluate the best interest of the child from its observances of the parties and witnesses; thus, a trial court's determination in a child custody case is entitled to great weight on appeal and will not be disturbed unless there is a clear abuse of discretion.
> >
> > *Hawthorne v. Hawthorne*, 96–89, p. 12 (La.App. 3 Cir. 5/22/96), 676 So.2d 619, 625, *writ denied*, 96-1650 (La.10/25/96), 681 So.2d 365.
>
> *Gremillion v. Gremillion*, 07-492, p. 4 (La.App. 3 Cir. 10/3/07), 966 So.2d 1228, 1231–32, *writ denied*, 10-2125 (La.12/10/10), 51 So.3d 726.

*Stewart v. Stewart*, 11-1334, p. 2 (La.App. 3 Cir. 3/7/12), _So.3d_.

**Assignment of Error No. One**

In her first assignment of error, Dodie argues that the trial court erred in awarding *ex parte* temporary sole custody of the children to Ron and limiting Dodie's visitation with Noah to supervised visits every other weekend from Saturday morning at 9:00 a.m. to Sunday afternoon at 5:00 p.m. and for failing to sanction Ron for his false and slanderous allegations against Dodie. Specifically, Dodie asserts that Ron's allegations of abuse and neglect were found invalid by the Department of Children and Family Services (hereinafter "OCS"), and that the Hearing Officer recommended that Ron's allegations be dismissed if the court were to find no merit to them. As a result, she argues, the trial court should not have awarded Ron temporary custody in August of 2010. Dodie also requests that the trial court's judgment on temporary custody and supervision be thrown out, and for the evidence to be reviewed *de novo*. We reject these contentions.

Ron, in his brief, argues that the Hearing Officer's report contained recommendations to the trial court and should not be dispositive of whether the trial court's judgment should be upheld. Ron points to evidence, outside of the

allegations contained in the Hearing Officer's report, which supports the decision of the trial court to award Ron temporary custody and to order that Dodie's visitation be supervised. Ron asserts that Dodie decided without consulting him to reacquaint Tyler with his biological father, Robert. Ron argues that this decision and Dodie's comments and behavior caused Ron and Tyler to become estranged. Dodie admitted to inappropriately disciplining Tyler by pinching his nipples on one occasion, and on another pushing him, causing him to fall onto the bed.

In its Reasons for Ruling, the trial court stated:

> The Court finds that MS. PREJEAN made the decision to introduce Tyler to his biological father in an effort to alienate Tyler from MR. PREJEAN. As evidence of her intent MS. PREJEAN sent a text message to MR. PREJEAN telling him that she and Mr. Arceneaux were planning to move in together. Tyler told MR. PREJEAN that this was done specifically to make him angry. In her testimony[,] MS. PREJEAN admitted that the text was untrue and designed to hurt MR. PREJEAN.

> MS. PREJEAN's plan to alienate Tyler from MR. PREJEAN was successful. MR. PREJEAN saw Tyler for a portion of the weekend following the reunification with Mr. Arceneaux[,] which was Mother's Day weekend[,] and then did not visit him for approximately fifteen (15) months[, thereafter.] Tyler also rarely spoke to MR. PREJEAN on the telephone and eventually telephone contact ceased as well. As further evidence of MS. PREJEAN's desire to alienate Tyler from MR. PREJEAN, she sent him a text message on June 29, 2009 in which she stated "it didn't take Tyler too long to figure out who you are, and Noah won't be too far behind."

> MR. PREJEAN was upset that Tyler had been introduced to his biological father without his knowledge or consent. MS. PREJEAN had painted Mr. Arceneaux as a rough individual[,] accusing him of being physically abusive and abandoning her and Tyler years earlier. MS. PREJEAN testified that Mr. Arceneaux had been very physically abusive toward her during their relationship, but that he had never harmed Tyler. MR. PREJEAN initially told Tyler that he had to choose one father, either him or Mr. Arceneaux. Though MR. PREJEAN denied this in his testimony, he admitted it to Ms. Moore during the evaluation and Tyler told Mr. Arceneaux the same thing. However, MR. PREJEAN's attitude about the matter changed over time. It is clear that the Stipulated Judgment signed on October 1, 2009[,] makes no mention of Mr. Arceneaux. Also, MR. PREJEAN told Tyler that he wanted to have a relationship with him and his door

was always open. MR. PREJEAN testified that he decided not to force Tyler to visit or speak with him.

Tyler testified that after he stopped visiting with his father that his mother would switch positions—sometimes denigrating MR. PREJEAN, but at other times encouraging Tyler to call him. Text messages introduced into evidence indicated this to be the case. At times MS. PREJEAN would try to encourage MR. PREJEAN to visit[,] but at others[,] she would become dismissive of his efforts.

The court goes on to describe Dodie's erratic and explosive behavior towards Tyler and Ron, and that Noah called Ron after locking himself in a closet due to a fight between Tyler and Dodie's father. Further, the evidence shows that Ron encouraged Tyler to try to make amends with Dodie. The evidence also shows that Dodie sometimes forbade Tyler from speaking to Ron and became angry when Robert allowed Tyler to do so. Tyler described an incident where he went to a friends's home to call Ron, Dodie found out, and she hit Tyler and started yelling at him and calling him and Ron names in the presence of Tyler's friend and the friend's mother.

After a review of the record, we reject Dodie's assignment of error. It is clear that even without considering the allegations in the OCS report, there is ample evidence to support the decision of the trial court. The evidence shows that the trial court was reasonable in its decision to award temporary custody to Ron and to order that Dodie's visitation be supervised. The trial court did not abuse its discretion in so finding.

**Assignment of Error No. Two**

Dodie contends that the trial court erred in finding a material change of circumstances occurred between the time of the October 1, 2009 Stipulated Judgment and the March 24, 2010 Rule for Change of Custody filed by Ron. Alternatively, the trial court erred in finding a material change of circumstances

9

occurred between the time of the October 1, 2009 Stipulated Judgment and the August 18, 2010 Motion for Ex Parte Custody.

Modification of custody is governed by the following rules:

> A party seeking to modify a custody decree which was a stipulated judgment must prove "(1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child." *Evans v. Lungrin*, 97-541, 97-577, p. 13 (La.2/6/98), 708 So.2d 731, 738. If the original custody decree is a considered decree, *i.e.*, one for which the trial court received evidence of parental fitness, the party seeking a modification must prove that continuation of the present situation is "so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." *Bergeron v. Bergeron*, 492 So.2d 1193, 1200 (La.1986).

*Winzor v. Winzor*, 03-329, pp. 3-4 (La.App. 3 Cir. 10/1/03), 856 So.2d 107, 111.

> Whether evidence is relevant or not is within the discretion of the trial court, and its ruling will not be disturbed absent a clear abuse of discretion. *Barnes v. Thames*, 578 So.2d 1155 (La.App. 1 Cir.), *writs denied*, 577 So.2d 1009 (La.1991). However, application of the change in circumstances rule to this case does not automatically preclude the introduction of all evidence of facts occurring prior to the stipulated custody judgment. The trial court should not exclude evidence in a custody modification proceeding if that evidence is relevant and material to an issue which the parties have not previously had "a full and fair opportunity to litigate". *Bergeron*, 492 So.2d at 1195.

*Smith v. Smith*, 615 So.2d 926, 931 (La.App. 1 Cir.) *writ denied*, 617 So.2d 916 (La.1993).

Dodie argues that "the trial court spent an inordinate amount of time on discussing events that pre-dated the October 1, 2009 Stipulated Judgment," and that the evidence that postdates the judgment can be explained by her attempts to control her out-of-control teenage son, Tyler. Also, Dodie claims that Ron and Robert conspired together to wrest custody from Dodie, by lying and influencing Tyler to lie when testifying. For these reasons, she argues, the trial court was

manifestly erroneous in finding that there was a material change in circumstances that warranted a modification of custody. We reject this argument.

In regards to the evidence the court used to make its custody determination, Dodie testified that many of the problems she experienced with Tyler escalated when she quit her job in January of 2010, which occurred after the October 2009 judgment. The record indicates that other incidents occurred after the stipulated judgment was entered. Between early 2010 and March 2010, Noah related accounts of fighting between Tyler, Dodie, and Dodie's father to Ron. It seems that on or about May 2010, Dodie began to encourage Tyler to contact Ron, and they experienced a brief period of harmony. However, matters deteriorated again. In one instance, Dodie became angry when Robert allowed Tyler to contact Ron, and Tyler stayed with his grandparents for several days as a result.

A physical altercation occurred when Tyler called Ron from his friend's home in August 2010, where Dodie struck Tyler with a paint stick and yelled at him in front of friends. In September of 2010, following Tyler's football game, Dodie arrived to pick up Tyler for visitation. After realizing that Ron and Jeanne were there with Tyler, Dodie and her father became aggressive towards Ron, Noah began to cry, and the police interfered, all of which occurred in front of sixty or seventy people at Tyler's high school. The record, then, supports the decision of the trial court in finding a material change in circumstances warranting a change in custody. Because the trial court did not base its decision on improper or irrelevant evidence, it did not abuse its discretion.

Dodie also claims that Ron and Robert conspired against her, made false allegations about her, and influenced Tyler to lie. The trial court, in its Reasons for Ruling, stated:

There is no question that Tyler exaggerated and lied at times depending upon who he was speaking with. Tyler wanted to leave his mother's home by any means. In order to convince everyone that he should move to New Orleans with his biological father, Tyler told several individuals that he had been seen by the football coach from John Curtis High School while he was jogging in the park and that the coach told Mr. Arceneaux that if he came out for football he would be a starter on the team. This was clearly an exaggeration by Tyler. In addition, when Tyler was put on the spot, he would often deflect responsibility by blaming the situation on others. According to the testimony of Perry Purcell [Dodie's brother-in-law], Tyler told him that MR. PREJEAN had a plan to get custody of him and his brother. Mr. Purcell advised Tyler to look up custody laws on the internet before he tried to make a decision on what was happening. He also told Tyler that he did not believe that MR. PREJEAN had his best interest at heart. There is no question that Mr. Purcell was placing Tyler on the spot. In doing so, Tyler alluded to a conspiracy between MR. PREJEAN and Mr. Arceneaux. The Court finds absolutely no evidence of a conspiracy in this matter between MR. PREJEAN and Mr. Arceneaux. Though Tyler may have said at various times that he wanted to live with Mr. Arceneaux to play football, the Court does not believe that that was his ultimate motive. Instead, it was to get out of MS. PREJEAN's house. The Court believes that Tyler was trying to find a graceful way to exit his mother's home. Also, though Tyler told Aaron Kibodeaux [Tyler's close friend] that there was a plan by MR. PREJEAN to get custody of him so that he could live with Mr. Arceneaux, this simply makes no sense. Mr. Arceneaux was well aware that Tyler could not live with him unless both MR. and MS. PREJEAN approved[,] as was discussed with Tyler in MS. PREJEAN's presence in May of 2010.

Tyler also exaggerated circumstances in his mother's home. He complained that there was no food in the house. Several witnesses testified that there was adequate food in the home. The maternal grandparents lived next door and fed the children from time to time. Tyler also testified that Noah was left in his care on numerous occasions requiring him to have to feed him with little food in the house. This appears to be an exaggeration, though Noah may have been left in Tyler's care during the day on rare occasions. Additionally, Tyler's complaints that there were men in and out of his mother's house proved to be unfounded. The Court finds that there was an incident when Tyler found a used condom wrapper in the bathroom trash can. Also, there may have been an incident when a male stayed overnight in the home which seemed to be verified by Aaron Kibodeaux. There was also an occasion where Tyler concluded some men stayed over when he saw several pairs of tennis shoes on the porch and observed them pushing their car out of the yard one morning. MS. PREJEAN testified that these individuals gave her a ride home the night before and their vehicle became stuck so she drove them home in her mother's car. Tyler assumed they slept over the night before. Tyler also accused MS. PREJEAN of coming

at him with a knife on one occasion and a screwdriver on another. The details were vague and the Court finds no truth to these allegations. Though Tyler suggested that the home was full of prescription drugs and Mr. Arceneaux witnessed MS. PREJEAN share some prescription medication with an individual, the Court finds no evidence that she sold drugs, used illegal drugs, or took legal drugs that were not prescribed to her. Though Tyler testified that his mother came home from bars at late hours slurring her words, the Court does not find that she abused alcohol in the presence of her children.

In light of the record before us, the evidence supports these findings. The trial court did not abuse its discretion in finding a lack of conspiracy between Ron and Robert.

**Assignments of Error Nos. Three and Nine**

Dodie argues that the trial court erred in finding it was in the best interest of the children for Ron to be named domiciliary parent and in its failure to grant exclusive medical authority to Dodie.

It is clearly established in Louisiana than courts shall award custody according to the best interest of the child. La.Civ.Code art. 131. Louisiana Civil Code Article 134 mandates that the trial court shall consider all relevant factors in determining the best interest of the child. Those factors may include:

(1)  The love, affection, and other emotional ties between each party and the child.

(2)  The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3)  The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4)  The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5)  The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6)  The moral fitness of each party, insofar as it affects the welfare of the child.

(7)     The mental and physical health of each party.

(8)     The home, school, and community history of the child.

(9)     The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10)    The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11)    The distance between the respective residences of the parties.

(12)    The responsibility for the care and rearing of the child previously exercised by each party.

La.Civ.Code art. 134.

In her brief, Dodie discusses each factor and opines that it is in the best interest of Tyler and Noah that they remain with her. She states, *inter alia*, that the boys had not lived with anyone else before the divorce, that Ron interfered with Dodie's attempts to get Noah tested and diagnosed for Asperger's Disorder, that she could provide a stable home environment, and that Ron's home is far from Tyler and Noah's school. Ron, on the other hand, asserts that he and Jeanne, who reside with Jeanne's young daughter, can provide a more stable and familial environment for Tyler and Noah, and that they have both excelled since living with him.

The trial court conducted an in-depth analysis of the best interest of the child:

In considering the factors under [La.Civ.Code art.] 134, the Court finds that the parties are on equal footing regarding many of the factors. The Court will only address those factors that favor one party over the other.

Though the children resided in MS. PREJEAN's home for most of their lives, the Court does not find that MS. PREJEAN provided the children with a stable[,] adequate environment. There was no testimony regarding Noah having contact with other children while in the care of his mother[,] other than at school, and these were not positive interactions. It seems that Noah spent a great deal of time with adults instead of other children or was alone in his room. Tyler

14

and Noah had almost no relationship and according to Tyler, Noah acted as if he was handicapped at his mother's home but acted like a normal child with his father. The Court notes that MR. PREJEAN's home is in a neighborhood and that Noah has made many friends and is playing on a soccer team. This is remarkable when considering MS. PREJEAN's description of Noah to Dr. Gillespie [Noah's former doctor] that he played alone and not well with others, that he had no real friends, suffered from low self-esteem and thought everyone hated him. Noah now gets along very well with his brother with whom he shares a room. Also, Noah has developed a close relationship with his step-sister, Lauren, as well as his stepmother. Noah seems to be more relaxed and has not been exhibiting the same obsessive compulsive behaviors as he did at his mother's home.

There was also a great deal of strife and conflict in MS. PREJEAN's home between herself and Tyler. MS. PREJEAN was having trouble adjusting to the divorce; she had job stress and was participating in extensive counseling. She was also trying to satisfy the demands of Noah's school to solve his academic and behavioral problems. MS. PREJEAN was overwhelmed and emotionally unavailable to the children. Noah and Tyler did not interact much with each other, and Noah spent much of his time in his room or at his grandparents. Tyler's statement to the Office of Community Services indicates that meals were not prepared regularly in the home by MS. PREJEAN. Aaron Kibodeaux's description of the food in the home supports this conclusion. The boys and MS. PREJEAN do not appear to have had much of a home life. MR. PREJEAN's home is calm and functions as a cohesive family unit.

As discussed above, Dr. Eckholdt testified that Noah could go far even with his borderline intellectual functioning, if he had self-confidence and as much education as possible. Without question, Noah has been functioning better in MR. PREJEAN's home. He now has friends and is on a soccer team, necessary components to improve his self-esteem. With regard to his education, MR. PREJEAN and his wife had already checked into getting him some tutoring at the Sylvan Learning Center to address the academic problems he was experiencing in school. As discussed above, the children have not done as well in school while in MR. PREJEAN's custody. However, the Court feels that once the children are no longer required to travel over eighty (80) miles per day to and from school and the stress caused by the litigation subsides, the children's grades should improve.

Tyler, who is presently fifteen years of age, is of sufficient age and has expressed a clear preference to continue to reside with his father. Noah stated on one occasion he wanted to live with his father, but on another said he wanted the judge to decide where he should live. Though Noah made several statements to Ms. Moore that indicate he wants to reside with his father, the Court does not find that Noah is of sufficient age to express a preference.

15

The Court finds that MS. PREJEAN has been unwilling to facilitate and encourage a close and continuing relationship between the children and MR. PREJEAN. As discussed above, she actually engaged in a pattern of behavior designed to alienate MR. PREJEAN from Tyler by speaking negatively about him in front of Tyler and by introducing him to his biological father. At present, MS. PREJEAN is completely estranged from Tyler which has resulted from her attempts to alienate him from MR. PREJEAN and her inappropriate discipline of him. Also, MS. PREJEAN has used visitation exchanges as an opportunity to embarrass and harass MR. PREJEAN.

Both parties and their families have been guilty of involving Tyler in adult issues. MS. PREJEAN discussed with him the reasons for the break-up of the marriage. MS. PREJEAN's brother-in-law, Perry Purcell, discussed the litigation with Tyler suggesting he look up custody laws on the internet and questioned his father's motives for seeking custody. MS. PREJEAN also had a discussion at a bowling alley with Tyler after the temporary custody hearing in which she told him what he did in Court in his testimony was wrong and that he would have to answer for it later in life. As a result of this conversation, Tyler refused to visit with his mother, and she chose not to push the issue. Placing pressure on Tyler and discussing the legal proceedings with him was inappropriate. MR. PREJEAN and his wife discussed and/or read Ms. Moore's report to Tyler and perhaps even Noah. This was inappropriate as well and constitutes a serious lapse in judgment.

Though MS. PREJEAN was the primary caregiver of the children from the time the parties separated until September of 2010 when MR. PREJEAN was granted temporary custody, the Court finds that her [role] as primary caregiver is far outweighed by the other factors discussed above.

The evidence before us, including that which shows Noah's social and self-esteem improvement, the stability of Ron's home, Tyler and Dodie's history, and the fact that Tyler and Dodie remain estranged, indicates that the trial court's decision to name Ron the domiciliary parent was reasonable. The trial court did not abuse its discretion in its decision.

We now turn to Dodie's contention that the trial court erred by failing to give her exclusive authority over medical decisions involving Noah. Dodie claims that Ron excluded her from a conference with the court-appointed evaluator, Dr. Eckholdt, and that Ron gave him a false history of Dodie's abuse and neglect of

16

Noah. She also argues that Dr. Eckholdt did not consult Noah's previous doctor and that he improperly administered the Asperger's diagnostic test. Ron argues that he, as domiciliary parent, should have sole discretion as affects Noah's medical treatment.

For the reasons discussed above, the trial court was reasonable in appointing Ron as domiciliary parent. The evidence supports that this arrangement is in the best interest of the children. For the same reasons, the court was reasonable in failing to place sole authority over Noah's medical treatment in the hands of Dodie.

We also note Dodie's complaints about Dr. Eckholdt's testing procedure. Dr. Eckholdt has a Ph.D. in counseling and psychology and a post-doctoral Master's degree in medical psychology. He is a licensed psychologist and medical psychologist in Louisiana. Dr. Eckholdt also has specialized training in developmental disabilities including Asperger's Disorder. The trial court stated its reasons for accepting Dr. Eckholdt's testing procedure and findings:

> MS. PREJEAN disagrees with Dr. Eckholdt's diagnosis because she did not speak with him at length. Also, Dr. Gillespie testified that Dr. Eckholdt improperly administered the Gilliam's Asperger's Disorder test. It seems Dr. Eckholdt filled out the questionnaire himself because he believed the test was to be filled out by a clinician. However, the testing protocol provides that the information should have been provided by a parent or teacher who knows the child well. In his testimony, Dr. Eckholdt did admit that he had improperly administered this testing instrument, but based upon the observations of Noah by him and his assistant, the test results, [and] the history given by MR. PREJEAN, he stood by his findings. The Court finds Dr. Eckholdt's findings to be valid. Many of Noah's behaviors noted by MS. PREJEAN are not present when the child is in MR. PREJEAN's care. Though both parties observed some obsessive compulsive behaviors in Noah at times, Dr. Eckholdt testified that this was caused by anxiety which he used to soothe himself when under stress. Also, Ms. Moore, a trained mental health professional, mentioned nothing in her report or her testimony to call Dr. Eckholdt's findings into question. The evaluation by Christine Dugas, LCSW, also found that Noah suffered from anxiety as opposed to Asperger's Disorder.

Because of Dr. Eckholdt's education and background, and because other psychological professionals made similar findings, we agree with the decision of the trial court accepting Dr. Eckholdt's testing procedure and findings.

**Assignments of Error Nos. Four and Five**

Dodie avers that the trial court erred in ordering reconciliation counseling for her and Tyler, and in ordering Noah counseling. In her brief, Dodie cites *Griffith v. Latiolais,* 10-0754 (La. 10/19/10), 48 So.3d 1058, in support of her claim that ordering counseling for her and Tyler and for Noah on his own is outside the trial court's scope of authority. However, *Griffith* is distinct from the underlying case, insofar as the court there ordered co-parenting counseling sessions as opposed to parent-child sessions or sessions for a child on his own:

> In conjunction with its award of sole custody, the court of appeal reversed the trial court's order that the parties continue co-parenting counseling sessions with Dr. Bouillion, and that they follow his recommendations regarding co-parenting. There is no provision in the law that allows the trial court to require continued counseling outside the parameters of La. R.S. 9:358.1. That statute allows the trial court on its own motion to appoint a "parenting coordinator" after it has entered a judgment establishing child custody for good cause shown.

*Griffith,* 48 So.3d at 1071.

Here, the trial court actually did order a parenting coordinator for Ron and Dodie in accordance with La.R.S. 9:358. However, that order is not at issue in Dodie's appeal. Instead, Dodie objects to the court-ordered counseling sessions for her and Tyler, and for Noah on his own. Given the recent tumultuous and acrimonious history between Dodie and her minor son Tyler, it is reasonable that the trial court ordered counseling for them with the goal of reconciliation. In regards to Noah's counseling, since both Ms. Moore and Dr. Eckholdt recommended an appropriate counselor to aid Noah with his anxiety disorder, the

18

trial court was also reasonable in so ordering. Therefore, the trial court did not abuse its discretion in ordering counseling in its custody decree.

**Assignments of Error Nos. Six and Seven**

In the next assignments of error, Dodie states that the trial court erred in finding her to be voluntarily underemployed and to have an earning capacity of $2,988.36 per month, an amount that she had not earned for eighteen months prior to the Judgment and was not capable of earning at the time of trial. She also argues that the trial court erred in awarding Ron child support in the amount of $807.33 per month.

Specifically, Dodie claims that she left her previous job at Workplace Staffing Solutions, where she reportedly made $2,988.36 per month, because she could not keep up with the hours and demands of the job and also care for her children, especially Noah. She states that she struggled to find permanent employment afterwards, but finally found a full-time job at Link Staffing Services. At the time of trial, she testified that she made $2,000.00 per month. She points out that she does not have a college degree and that she could not get her job back at Workplace Staffing Solutions. We reject these arguments.

Louisiana Revised Statute 9:315.11 states in pertinent part:

A. If a party is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of income earning potential, unless the party is physically or mentally incapacitated, or is caring for a child of the parties under the age of five years. In determining the party's income earning potential, the court may consider the most recently published Louisiana Occupational Employment Wage Survey.

B. The amount of the basic child support obligation calculated in accordance with Subsection A of this Section shall not exceed the amount which the party paying support would have owed had a determination of the other party's income earning potential not been made.

La.R.S. 9:315.11.

Ron argues that Dodie voluntarily resigned from her job and pointed out that she had held the job for six years. He states that the trial court correctly determined that Dodie was voluntarily underemployed based on Dodie's credibility and on factual considerations.

The trial court describes an instance when Dodie lied about her income while she was temporarily employed by KATC television, in the interim between her job at Workplace Staffing Solutions and Link Staffing Services:

> MS. PREJEAN also put on her pauper affidavit that she was employed at KATC television station earning only $1,000.00 per month. In her testimony, she stated that she was actually earning $2,000.00 per month. She first tried to explain that she did not understand the forms[,] and then said it was probably because it was around the time she resigned from KATC. MS. PREJEAN signed the affidavit on August 2, 2010. In her testimony, she testified that she resigned from KATC and began working at Link Staffing in Crowley earning about the same amount of money she earned at KATC. Since there seems to be no gap in employment, MS. PREJEAN's testimony does not support her explanation as to why her affidavit represented that she only earned $1,000.00 per month.

The trial court found that Ron earns $2,383.00 per month, and that Dodie quit her employment in January or February of 2010, when she was earning $2,988.36 per month, which the court found to be her earning capacity. The trial court attached an Obligation Worksheet A form to its Reasons for Ruling, wherein it outlines the parties' earnings, their percentage of shared income, the basic and total child support obligations, and calculates each parties' obligations. Dodie's child support obligation is calculated at $807.33, and Ron's is calculated at $643.66. Based on Dodie's credibility and the fact that she resigned from a job she held for six years, we agree with the trial court's determinations and affirm this aspect of the final judgment.

**Assignment of Error No. Eight**

Dodie contends that the trial court erred in assessing Dodie with all costs of the proceedings except the costs of her rule for contempt. She states that she sought her Rule for Modification of Custody, where she sought sole authority over the children's health, thereby prolonging litigation, in order to get Noah the medical treatment and diagnosis he needs to succeed. Ron argues that the court did not err in assessing costs to Dodie.

A court may assess costs on its own discretion: "[u]nless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." La.Code Civ.P. art. 1920. In the underlying case, based on the events described in the record and Dodie's credibility, the trial court did not abuse its discretion in assessing Dodie with costs. We affirm this ruling of the trial court.

**CONCLUSION**

As a preliminary matter, we deny the Appellant's motion to stay the appeal. We affirm the trial court's judgment in its entirety. We agree that a material change in circumstances has occurred such that Ron should be the domiciliary parent. We affirm the ruling ordering Appellant Dionysia Prejean and Tyler go to rehabilitation counseling and that Noah go to counseling for his anxiety issues. We affirm the rulings designating Ms. Prejean as voluntarily underemployed and approve the calculation of earnings and child support obligations. Finally, we affirm the assessment of trial court costs to Ms. Prejean. All costs of the appeal are assessed to Appellant, Dionysia Prejean.

**MOTION TO STAY APPEAL DENIED, JUDGMENT AFFIRMED.**

21